IN THE SUPREME COURT OF TEXAS
 
════════════
No. 
10-0245
════════════
 
Patrick O. Ojo, On Behalf of 
Himself and
All Others Similarly Situated, 
Appellant
 
v.
 
Farmers Group, Inc., Fire 
Underwriters Association,
Fire Insurance Exchange, 
Farmers Underwriters Association,
and Farmers Insurance 
Exchange, Appellees
 
════════════════════════════════════════════════════
On Certified Question from the 
United States
Court of Appeals for the Ninth 
Circuit
════════════════════════════════════════════════════
 
 
Argued October 14, 2010
 
 
            
Justice Willett, concurring 
in part.
 
 
            
The Court is right that today’s outcome is dictated by the Insurance Code as it 
is written.  That being so, I wish the Court were more inhibited to do what 
we have prohibited—mine extratextual clues to illuminate an already-unambiguous 
statute.  Text alone does not answer every question, but it answers many, 
including today’s, as the Court concedes.  I accept a cautious (and 
non-villainous) role for extrinsic aids, including certain legislative history, 
where a nebulous statute is susceptible to varying interpretations,[1] but our rule for unambiguous statutes is 
uncomplicated: “Where text is clear, text is determinative,”[2] making any foray into extratextual aids 
not just inadvisable but, as we have repeatedly derided it, “inappropriate.”[3]
            
The Court nowhere states—or even suggests—the Insurance Code is ambiguous.  
But even assuming arguendo it is, “thus justifying cautious use of 
secondary construction aids,”[4] the Court beckons some strange ones, 
including some we have consistently decried as patently unreliable (like failed 
bills in a subsequent Legislature).  The Court’s detour may be well 
meaning, but it is not well supported, and I regret its “disparate impact” on 
our interpretive precedent.  I would hold to our holdings—when the 
Legislature speaks plainly, the judiciary should as well.  In other words, 
and applying a rule less prudish than prudent, if it is not necessary to look 
further, it is necessary not to look further.  An unembellished 
interpretation of an unambiguous statute can be spare without being 
sparse.  For these reasons, I agree with all but Part III.C of today’s 
opinion.
            
As for Chief Justice Jefferson’s 
concurrence, I confess it vexes me.  It at once espouses methodological 
stare decisis, that our interpretive rules merit precedential effect, yet 
declines to embrace it.  It reaffirms our concretized rule that “extrinsic 
aids are inappropriate to construe an unambiguous statute,” yet allows 
legislative history a “general background” and “non-interpretive” role.[5]  Boiled down, legislative materials 
cannot be used to construe but can be used to contextualize.  
This distinction strikes me as gossamer-thin (and is notably undrawn by the 
Court itself).[6]  Given that context is baked into 
construction, I cannot easily discern at what epochal point “contextualizing” 
(permitted) ends and “construing” (prohibited) begins.  In my view, such 
opaque differentiations incautiously invite semantic gamesmanship (by litigants, 
legislators, and judges alike), and I am concerned that one judge’s context is 
another judge’s pretext.  One mystifying (and hazardous) byproduct of the 
proposed context/construction distinction: Judges using legislative history to 
“contextualize” apparently have unfettered license to rely on materials (like 
subsequent failed bills) that precedent roundly condemns as untrustworthy.  
How can something we have discarded as absolutely unreliable suddenly rate 
absolute reliance?  And how exactly are readers, absent an express 
disclaimer, to divine the true interpretive basis of a court’s decision?  
The concurrence depicts judges as “storytellers,”[7] but given that context and construction 
are inextricably fused, how can one know when a court is telling a story versus 
selling a story?
I. The Court 
Rightly Holds the Statute is Unambiguous, Making it “Inappropriate” to Rummage 
Around in Legislative Minutiae.
            
The Court’s textual analysis is clear, careful, and convincing.  The crux 
is whether scoring is based on race, not bears on race.
            
Beyond the Insurance Code’s use of “based on”[8] and “because of”[9] is its conspicuous non-use of 
disparate-impact language.  I say conspicuous because at least two other 
Texas antidiscrimination laws predating these Insurance Code provisions—one in 
the Labor Code and one in the Government Code—expressly authorize 
disparate-impact liability in other areas.[10]  The Legislature knows well how to 
permit such claims, and the inclusion in those laws suggests something about its 
exclusion in this law: It was intentional.  We should generally presume the 
Legislature “acts intentionally and purposely in the disparate inclusion or 
exclusion” of particular statutory language,[11] and it would exceed our judicial 
function “to eliminate clearly expressed inconsistency of policy” when an 
unambiguous statute collides with policies adopted in related statutes.[12]  Unlike other Texas laws, the 
textual focus of the Insurance Code is solely motivative, not resultive, asking 
if credit scoring purposely draws racial lines or merely falls along such 
lines.  In my view that ends the inquiry, textually and 
contextually.
            
Instead of calling it a day, however, the Court swerves into the flotsam and 
jetsam of legislative history.  This roundabout detour is a little jarring 
given our forceful pronouncements over the years that unambiguous text equals 
dispositive text.  By and large, this is a text-centric Court.  Less 
than eight months ago, and 9-0, we cemented our commitment to determinacy in 
Texas Lottery Commission v. First State Bank of DeQueen, holding that 
extrinsic sources have no place when unambiguous text yields a non-absurd 
result.[13]  This point about ambiguity is 
mighty unambiguous, and mighty settled given our repeated reaffirmations in 
2006,[14] 2007,[15] 2008,[16] 2009,[17] 2010,[18] and 2011.[19]  As we held in DeQueen, 
materials outside the statute matter little—actually, not at all—when a statute 
itself decides the case.  I pray DeQueen has not been 
dethroned.[20]
            
 This Court has not adopted an overarching interpretive methodology to 
govern all statutory-interpretation cases, but we have agreed on one elemental 
rule: Definitive text equals determinative text, the singular index of 
legislative will.  In other words, ambiguity is a prerequisite for wielding 
the extratextual tools listed in the Code Construction Act.  A mere 84 days 
ago, we held that “[w]hen a statute’s language is nebulous and ‘[t]he point of 
disagreement lies between two plausible interpretations,’ we resort to 
additional construction aids to divine the Legislature’s intent”—and only 
then did we look to the Code Construction Act.[21]  The precedential takeaway is that 
while we sometimes consult the Act’s permissive tools, we do so only on tip-toe 
and only when faced with “unclear” language.[22]  The springboard for diving into 
legislative history is ambiguity.
            
Our cases steadfastly decline the interpretive free-for-all that occurs when 
courts peek behind plain language.  Instead we have opted for a simpler and 
less-manipulable principle: Clarity means finality, and judges should read the 
laws that govern our lives in a manner faithful to what those laws actually 
say.  In other words, the Code Construction Act may provide us with a 
buffet of interpretive options.  But smartly, we have been picky 
eaters.  The Act’s language is permissive: We may consider outside 
aids even absent ambiguity.  The Court’s rule, however, has been mandatory: 
We shall not, and doing so is forbidden.
            
Regrettably, today’s departure from interpretive precedent is not limited to 
legislative history.  The Court also considers an Insurance Commissioner 
report that while credit scoring, like all factors used to price insurance, 
might impose a disproportionate impact, it is not unfairly or intentionally 
discriminatory under the law.  The Court claims to cite the Commissioner’s 
2005 report “more for evidence of the Texas Legislature’s awareness of potential 
disparate impacts” than for the Commissioner’s reassuring construction that 
disparate-impact claims are not cognizable under the Insurance Code.[23]  Three brief responses: (1) the 
Court justifies relying on the report by citing the Code Construction 
Act, which invites consideration of “administrative construction of 
the statute” in order “to determine the Legislature’s intent”;[24] (2) the Legislature was already mindful 
of disparate impact when it first authorized credit scoring two years earlier, 
according to the Court’s own reliance on a 2003 House Research Organization bill 
analysis and also the Legislature’s 2003 request for an interim study that would 
examine disparate impact in credit scoring;[25] and in any event (3) any renewed 
legislative “awareness” in 2005 (when two bills failed to ban credit scoring 
outright) is wholly irrelevant to what an earlier Legislature with different 
members intended in 2003 when it authorized credit scoring.  It seems to me 
the Court discusses the report “more” because the Commissioner’s no-liability 
construction confirms the Court’s no-liability construction, rather than as a 
multi-page prelude to a single sentence regarding two bills unenacted by a 
subsequent Legislature.
            
Our reluctance to wield the Code Construction Act’s extrinsic aids absent 
statutory ambiguity extends beyond legislative materials.  The Act does 
invite judges to consider the “administrative construction of the statute” even 
if the statute by its terms is crystal clear.  “Thanks but no thanks” has 
been our steadfast reply.  This Court does not consider agency 
interpretations of unambiguous statutes.  A generation ago, we articulated 
that “[i]f the [statute being construed is] plain and unambiguous, there is no 
need to resort to rules of construction, and it would be inappropriate to do 
so.  If, on the other hand, the meaning of the provision be doubtful or 
ambiguous, the construction placed upon a statutory provision by the agency 
charged with its administration is entitled to weight.”[26]  Fast forward to just a few weeks 
ago, when we reaffirmed that principle, repeating that before we even 
consider the reasonableness of an agency’s interpretation, much less 
grant it deference, “the [statutory] language at issue must be ambiguous; 
an agency’s opinion cannot change plain language.”[27]  If there is no ambiguity, “that is 
the end of the inquiry.”[28]  Today, with whiplash-inducing 
speed, the Court says the opposite, that even absent ambiguity, it will 
consider an agency’s construction of the statute—and not merely as 
noninterpretive “background,” but rather, as the Court declares, “to determine 
the Legislature’s intent.”[29]
            
My respectful plea is for the Court to bring more predictability to its 
bread-and-butter work of statutory interpretation.  As this case teaches, 
it is one thing to state consistent rules; it is another to stick 
to them.  What are lower-court judges and litigants to do when 
early-2011’s interpretive consensus suddenly becomes mid-2011’s interpretive 
conflict?  How are everyday Texans to order their affairs with certainty if 
the methodological goalposts shift to-and-fro from case to case?  
Interpretive clarity advances both stability and transparency, essential virtues 
that benefit legislators who draft statutes, agencies that implement them, 
courts that interpret them, and citizens who live under them.
II. In Today’s Age of “Legisprudence”—Judges Construing 
Statutory
Texts—Interpretive Consistency is 
Vital.
            
Methodology matters.  The lion’s share of modern-day appellate judging is 
“legisprudence”—interpreting statutes.  Day by day, the universe of 
free-form, common-law judging shrinks, meaning the bulk of this Court’s time is 
spent deciding what the Legislature’s words mean.  Hence the tumultuous 
statutory-interpretation wars, since what judges decide is often shaped 
by how judges decide.  I believe our legal system, which erects a 
framework for broader society, serves the public best when it provides clear 
guidance, consistently applied.
            
Predictability matters.  Vacillation occasioned by the absence of set 
interpretive rules (or variance from them) breeds confusion.  When we say 
we are taking the Legislature at its word, Texans are entitled to take us at 
ours.  Are our oft-stated rules of statutory interpretation fixed or are 
they fluid?  Discarding our simple-but-settled rule barring secondary aids 
absent ambiguity raises the question of when exactly does the Court deem 
it appropriate to do what we have repeatedly branded as “inappropriate.”  
Upon what basis will the Court determine that extratextual tools have a 
legitimate role even when the controlling statute is clear on its face?  
Honoring set interpretive rules recognizes that society operates “in the shadow 
of the law.”  Texans embroiled in legal disputes (or trying to avoid them) 
doubtless appreciate interpretive determinacy, which lets everyone know where 
the Court stands—everyday Texans looking to conduct business, lawyers looking to 
advise them accurately, courts looking to decide cases consistently according to 
clear guidance, and lawmakers looking to draft laws with assurance of how they 
will be interpreted.
            
The Court holds, rightly, that the Insurance Code as written decides this 
case.  That unambiguity pulls the plug on consulting legislative history, 
which is either impermissible (if used to affect meaning) or extraneous (if not 
used to affect meaning).  Our precedent simply does not allow the Court to 
have it both ways.
III. Even if the Insurance Code Were Ambiguous, 
the Court Relies on Some
Legislative 
Materials We Have Rejected as Unreliable.
            
Even if one reads the Insurance Code as nebulous, thus inviting guarded 
consideration of extrinsic materials, some of what the Court considers is 
troubling.  Legislative materials are not created equal; some are more 
authoritative than others.  We have not adopted an overarching 
legislative-history hierarchy to help separate wheat from chaff and guide our 
wary and infrequent reliance on such materials.[30]  Even so, the Court errs in 
consulting two items that rank notoriously low on the reliability scale: (1) the 
fact that two bills banning credit scoring died in committee,[31] and (2) a House Research Organization 
bill analysis summarizing the views of unidentified opponents of the 
credit-scoring bill.[32]
            
Most troubling is the Court’s “perilous”[33] reliance on two failed bills in 2005 
that would have banned credit scoring in pricing certain lines of 
insurance.[34]  The Court states that given the 
bills’ failure, it “can only conclude” that the Legislature did not intend to 
allow disparate-impact liability.[35]  That is not so.  A review of 
precedent “can only conclude” that interpreting language passed in 2003 through 
the prism of language unpassed in 2005 enjoys scant legal support.
            
First, “subsequent legislative history is a ‘hazardous basis for inferring the 
intent of an earlier’ Congress.”[36]  The United States Supreme Court 
reiterated this wariness just three months ago: “Post-enactment legislative 
history (a contradiction in terms) is not a legitimate tool of statutory 
interpretation.”[37]  And such reliance is “particularly 
dangerous . . . when it concerns, as it does here, a proposal that does not 
become law.”[38]
            
The operative judicial inquiry is what did the Legislature in 2003 mean 
by the credit-scoring language it voted into law, not what legislators in 
2005 thought their predecessors meant (or should have meant).[39]  Thus, contrary to the Court’s 
description, the two failed bills, as a factual matter, are undeniably not part 
of “[t]he legislative history of the credit scoring bill” from two years 
earlier.[40]  Rather, they are akin to post-hoc 
evidence seeking to color our interpretation of earlier-passed 
legislation.  Importantly, we have never permitted such items to 
enter our analysis,[41] even in what the concurrence would 
consider a “non-interpretive” and context-providing fashion.  I would not 
second-guess the settled wisdom that allowing bills filed in a subsequent 
legislative session to affect the meaning of an earlier-passed statute “would 
set a dangerous precedent.”[42]
            
Second, the bills (identically worded companion bills) in no way proposed 
disparate-impact liability; rather they proposed to ban credit scoring 
outright.  The bills never mentioned disparate impact one way or the other, 
much less expressly authorized such claims as do the Labor and Government 
Codes.  Our unbroken precedent for 40-plus years (and United States Supreme 
Court precedent for just as long) rejects reliance on failed bills.[43]  As recently as 2009, we reaffirmed 
that “we attach no controlling significance to the Legislature’s failure to 
enact [legislation].”[44]  A generation earlier, we 
recognized an age-old legislative truism, equally true today, that bills often 
die “for reasons wholly unrelated to the Legislature’s view of what the original 
statute does or does not mean.”[45]  Legislative inaction, we thus 
held, “would afford a dubious distinction for drawing an inference of 
[l]egislative intent one way or the other.”[46]  Our unwavering position since then 
has been that divining legislative intent from dead bills requires naked 
“inference” involving “little more than conjecture.”[47]  For even longer, the United States 
Supreme Court has reiterated its “reluctan[ce] to draw inferences from Congress’ 
failure to act.”[48]  Indeed, because legislative 
inaction is susceptible of multiple interpretations, even High Court decisions 
that have mined other types of legislative history have, in the same opinion, 
frowned upon attaching importance to failed bills, reasoning that “unsuccessful 
attempts at legislation are not the best of guides to legislative 
intent.”[49]  Most recently, the Court warned 
“[i]t is always perilous to derive the meaning of an adopted provision from 
another provision deleted in the drafting process.”[50]  As a matter of law and logic, that 
peril seems even graver in this case, where the Court looks not to provisions 
deleted while the credit-scoring bill itself was being drafted, but rather two 
bills that failed years later.  The Court offers no reason why such 
“evidence,” rejected as untrustworthy in 2009, is suddenly trustworthy in 
2011.
            
Of this there can be no doubt: Bills die in the Texas Legislature for reasons 
both innumerable and inscrutable—“there are many reasons for saying no.”[51]  Lending any weight to the fact 
that two bills “died in committee” two years later contravenes our unbroken 
precedent and also potentially pivots on something perhaps nonpivotal.  It 
may be much ado about nothing, or much ado about something, but that something 
can never be known.  It is less legislative history than legislative 
mystery.
            
Also worrisome is the Court’s reliance on a House Research Organization bill 
analysis and its summary of the views of the credit-scoring bill’s unidentified 
detractors.  HRO is a nonpartisan and independent department of the House 
with a well-earned reputation for impartiality and professionalism.[52]  It provides a wide range of 
information on policy issues facing state government, and its myriad reports are 
undoubtedly helpful to individual legislators and their staff.  But as HRO 
itself acknowledges, its publications “are not an official part of the 
legislative process nor an official expression of the views of the Texas House 
of Representatives.”[53]  By contrast, bill analyses 
prepared by a legislative committee are attributable to that committee (though 
often authored by legislative staff or outside interests who are promoting the 
bill).  The bill analyses prepared by HRO and by legislative committees 
differ in timing, authorship, audience, content, and purpose, and only committee 
bill analyses are considered part of the formal legislative process.  

            
In any event, the statements of bill opponents, like failed bills, are 
discredited indicators of statutory meaning.  “Courts almost never rely on 
representations about legislation by opponents, who have every incentive to 
misstate the bill’s effect.”[54]  Justice Frankfurter 63 years ago 
recognized the “common practice” (even then) by those “with their own axes to 
grind” manipulating the legislative record in order to assure “desired glosses 
upon innocent-looking legislation.”[55]  That same year, Justice Jackson 
similarly observed that “[i]t is a poor cause that cannot find some plausible 
support in legislative history.”[56]  That out-and-out untrustworthiness 
explains why, in the hierarchy of legislative material, “statements by opponents 
are among the least authoritative, as they are meant to defeat the bill in 
question and do not represent the considered and collective understanding of 
those . . . who passed the bill into law.”[57]  Bryan v. United 
States[58] is instructive on this point.  In 
that case involving an ambiguous statute, the United States Supreme Court 
consulted selected bits of legislative history but drew a firm line at 
considering statements by bill opponents.  The Court explained, “[t]he 
fears and doubts of the opposition are no authoritative guide to the 
construction of legislation,”[59] because, “[i]n their zeal to defeat a 
bill, they understandably tend to overstate its reach.”[60]  It is revealing that even when 
courts delve into the recesses of legislative history, most pay no attention to 
bill opponents given “the well-recognized phenomenon of deliberate manipulation 
of legislative history.”[61]  And of course the more judges rely 
on it, the less reliable it becomes, as “technocrats, lobbyists and attorneys 
have created a virtual cottage industry in fashioning legislative history so 
that the Congress will appear to embrace their particular view in a given 
statute.”[62]  With good reason the laws of 
evidence are wary of records that are prone to being corrupted in order to 
posture for eventual litigation—“so are legislative histories, which often have 
become seedbeds for interested parties to plant pre-litigation amicus 
briefs.”[63]
            
These doubts regarding authoritativeness are especially well-warranted when one 
understands the nature and preparation of HRO bill analyses, which, as HRO 
itself acknowledges, “are not an official part of the legislative 
process.”[64]   When a bill clears its House 
committee and heads for the floor, HRO prepares a bill analysis that, in part, 
summarizes the views of supporters and opponents.  But importantly, when an 
HRO bill analysis speaks of “opponents,” it is referring principally to 
nonlegislative opponents, the outside lobbyists and other third-party 
advocacy interests—plus everyday civic-minded Texans—who have weighed in for, 
on, or against a bill.  HRO staff may listen to audio (or watch video) of 
the committee hearing, but if time is short they may not.  HRO will contact 
those who registered at the hearing and solicit their two-cents’ worth.  
But if a committee hearing is sparsely attended, HRO will reach out to a range 
of other activists and interest groups it surmises might have an interest in the 
bill, whether or not they ever formally weighed in.  HRO will also gather 
online and other written advocacy materials from those who want to influence the 
bill’s fate.
            
Finally, the Court’s statement that the opponents’ views indicate “that the 
Texas Legislature was aware of the possibility of a disparate impact”[65] is factually untrue.  HRO is a 
House entity that prepares information for House  members, just as the 
Senate Research Center provides information for senators.  The Court 
indulges a naked inference that the Legislature as a whole had studied the HRO’s 
summary of what certain unidentified opponents, who may not have even attended 
the committee hearing, had to say.
            
Unsuccessful bills and unsuccessful bill opponents—“I can think of no better 
example of legislative history that is unedifying and unilluminating.”[66]  I side with Justice Jackson, who 
believed, consistent with our precedent, that resort to legislative history “is 
only justified where the face of the Act is inescapably ambiguous.”[67]  As he elegantly explained: “Laws 
are intended for all of our people to live by; and the people go to law offices 
to learn what their rights under those laws are.”[68]  And even if citizens could afford 
the “cost of repeatedly examining the whole congressional history,”[69] they still “would not know any way of 
anticipating what would impress enough members of the Court to be 
controlling.”[70]  Thus, to allow legislative history 
to modify statutory meaning “is to make the law inaccessible to a large part of 
the country.”[71]  I would not inflict another layer 
of expense and complexity where the Legislature has already spoken 
plainly.
IV. It is Perplexing Why The Court Abruptly Changes 
Interpretive 
Course in This Case. 
 
            
Given our oft-professed allegiance to unambiguous language, it is difficult to 
understand the Court’s decision to peek behind ambiguity-free text without 
asking a simple question: Why?  What is distinctive about this case that 
warrants departing from our firm—and recently reaffirmed—maxim that extrinsic 
aids are “inappropriate” where the statute itself decides the case?
            
It is true that this case involves a sensitive public-policy matter, but we have 
not to this point altered our ordinary interpretive rules for controversial 
cases.  Indeed, few cases since I joined the Court have stoked more 
rancorous debate than Entergy Gulf States, Inc. v. Summers,[72] our 2009 workers-compensation 
decision.  There, Summers and several amici (including some legislators) 
implored the Court to embellish its analysis “by going beyond the statutory text 
and looking to extrinsic aides [sic] such as the Act’s legislative 
history.”[73]  Given the Act’s textual clarity, 
we declined, instead repeating our time-honored rule: “[W]e have been clear that 
we do not resort to such extrinsic aides [sic] unless the plain language is 
ambiguous.”[74]  As shown by Entergy, for 
all its sound and fury, sensitive cases have not desensitized us to our prior 
holdings.  Even then, we chose methodological consistency over the view 
that certain controversies merit scrapping our settled rule that “[w]here text 
is clear, text is determinative,”[75] meaning “the judge’s inquiry is at an 
end.”[76]
            
So I remain flummoxed as to why the Court, which declares this case can be 
decided under the Insurance Code alone, instead blazes a new interpretive 
trail.  Whatever the reason—and I hope it is not subject-matter 
sensitivity, as even disparate-impact cases require non-disparate 
treatment—differentiated standards no doubt confound litigants embroiled in 
other disputes who expect their cases will be reviewed according to consistent 
rules, consistently applied.  Every case that arrives at this Court is 
consequential; every case deserves our most painstaking study; and every 
litigant must have confidence that his legal questions are being answered under 
unvarying “rule of law” standards from case to case.
            
Jurists of goodwill have diverse views regarding legislative history—when to use 
it and how to use it.  And while I side with the textualists, I well 
understand the counterarguments.  My concern today is focused narrowly on 
cases where the Legislature’s words decide the case all by themselves.  And 
my regret is the Court’s abandonment of its text-minded moorings absent any 
showing, or even assumption, of textual ambiguity.  Because the Insurance 
Code is clear, particularly when juxtaposed against the Labor and Government 
Codes, I would not look beyond it.  If this statute were unclear, I 
would consider a sensible legislative-history hierarchy that, in part, would 
reject sources we have repeatedly decried as unreliable.
V. The Concurrence Rests Upon a Meringue-Like 
Distinction, That Context
Can Be Divorced 
From Construction.
            
The concurrence labels as its “animating principle” the rejection of any 
interpretive role for legislative history when statutory text is clear.[77]  That principle, one I welcome, 
stands in tension with the Code Construction Act, which invites courts to 
consult legislative history “[i]n construing a statute” and to do so 
“whether or not the statute is considered ambiguous on its face.”[78]  As I read Chief Justice Jefferson’s concurrence, 
Texas courts should steadfastly decline the Act’s open-ended invitation to 
utilize extrinsic aids when construing unambiguous statutes.  So far, so 
good.  But then comes a potentially rule-swallowing exception: Such 
material can play a “non-interpretive” role, like providing context or “general 
background.”  This is a puzzling distinction, and one that handily 
shoehorns forbidden material into the mix.
            
First, in another case decided today, we reaffirm the truism that context is 
inseparable from construction: “Language cannot be interpreted apart from 
context.”[79]  They are indivisible, an elemental 
point applicable not just to legal language but to all language.  A 
statute’s words always reign supreme, but statutory meaning is not always found 
solely in strict literal parsing; it turns wholly on context.  Modern 
textualism is not allergic to context, and I have dissented when I thought the 
Court was taking literalism too literally and adopting a wooden construction 
foreclosed by statutory context: “The import of language, plain or not, must be 
drawn from the surrounding context,” a self-evident rule rooted in common sense, 
Texas statutory law, and caselaw from both this Court and the United States 
Supreme Court.[80]  Indeed, even the same word can 
mean diametrically opposite things depending on the context.[81]  As Justice Scalia, textualism’s 
staunchest and most prominent proponent, puts it, “In textual interpretation, 
context is everything.”[82]  That being true, a judge reading a 
statute must always consider “the surrounding statutory landscape”[83] and be mindful of context—but more 
specifically, interpretive context.
            
Granted, jurists of divergent philosophical stripes might disagree on the best 
elements of context and where they lead, but modern textualists agree 
that language cannot be isolated from its surrounding context.  Indeed, 
even the word “context” must be read in context.  It means one thing when 
detailing a case’s background facts and how it came before us, but something 
else when ascertaining textual meaning and explaining to readers how we reasoned 
our way to a conclusion.  When construing even a facially clear statute 
that seems intuitively obvious, we may well look to related legislation plus 
other extra-statutory contextual cues to glean the text’s accepted semantic 
import (grammatical conventions, treatises, dictionaries, specialized legal or 
technical usage, colloquial nuances, judicial interpretations from other 
jurisdictions, and so forth).[84]  In other words, we tackle it much 
like the Court does today, minus the jolting digression into legislative 
history.  That is, we seek interpretive context, a reading rooted in 
textual and structural evidence.  So when we are construing statutes like 
the credit-scoring bill, we give precedence to semantic context (how a skilled 
user of words would read the statute); we do not consider or second-guess policy 
context (how well those words achieve the statute’s apparent policy 
goals).[85]  This approach, our precedent 
teaches, is more faithful to the Legislature’s policymaking supremacy and more 
respectful of the complex and grueling hurdles that bills (and the compromises 
embedded within them) must scale to become law.  In this case, as the Court 
ably explains, semantic context points to a clear, and therefore determinative, 
meaning.  I would stop there.
            
Second, the Court nowhere adopts the context/construction distinction posited by 
the concurrence.  Chief Justice 
Jefferson assures readers that the Court “makes no attempt to construct 
the statute’s meaning by looking at its history,” and none of the cited tidbits 
are being used “to construe” the Insurance Code, “thus the Court follows our 
standard practice.”[86]  The Court itself, though, steers 
clear of the construction/context demarcation.  Indeed, its foray into 
legislative history and other extrinsic material makes sense only as a method of 
construction, as an attempt to lend interpretive weight.  The Court is 
aiming to give authoritative content to the meaning of Section 559.051, and it 
seems to concede as much.  Most telling, it cites as authority for peeking 
at legislative history the tellingly titled Code Construction Act which 
speaks of “construing a statute . . .”[87] not “contextualizing a statute.”  
(The concurrence parts company with the Court on this point, declaring that the 
Act’s extrinsic aids, including legislative history, have no interpretive role 
when a statute is unambiguous.)  Also revealing, the Court, in “determining 
whether the statute gives rise to a disparate impact theory of 
liability”[88]—in other words, interpreting the 
statute—cites three disparate-impact decisions from the United States Supreme 
Court that consulted legislative history, explicitly for interpretive 
purposes.  In those cases, the High Court, like this Court, was trying 
to fortify its interpretive analysis, using legislative materials to 
divine a statute’s meaning.[89]    The Court also 
attempts to justify its peek at legislative history “because the declared policy 
of the McCarran-Ferguson Act is to ensure that state legislatures are able to 
regulate the business of insurance without unintended federal interference.” __ 
S.W.3d at __.  I fail to see the relevance of this.  If anything, the 
desire for minimal federal intrusion would seem to welcome application, not 
frustration, of our ordinary interpretive regime.  Such use is apparent in the 
final paragraph of Part II of today’s opinion: “Given the [legislative 
materials],” the Court holds, “we can only conclude that the Legislature did not 
intend to create a cause of action for disparate impact discrimination.”[90]  That phrasing sounds remarkably 
like a Court that is construing a statute, not contextualizing one.
            
Third, the context/construction locution invites peculiar consequences.  
Under the concurrence’s view, because the Court is merely using legislative 
history for background purposes, it is 100 percent free to rely on materials we 
have rejected as innately unreliable.  The concurrence says we should not 
“blind ourselves to otherwise useful information.”[91]  That is precisely the point.  
We must be blind to material that cannot help us see.  We have derided 
failed bills as the polar opposite of “useful”—useless to be 
precise.  Similarly, the concurrence asks why we trust judges to make fair 
decisions after reciting compelling facts but not after looking at legislative 
history.[92]  The dilemma in this case is not 
untrustworthy judges but, as our cases explain, untrustworthy evidence such as 
failed bills and off-the-record comments from unidentified detractors bent on 
derailing legislation.
            
Even if the Court were using legislative materials merely to set the 
legal stage and nothing more, why would that permit reliance on a subset of 
material that we have spent decades condemning as untrustworthy?  Sound 
construction demands a sound foundation.  Surely a “dubious”[93] and “perilous”[94] foundation amounting to “little more 
than conjecture”[95] provides a rickety basis for 
construction.  Given that “context is everything” in textual 
interpretation,[96] I would expect the Court to be as 
insistent on reliable context as it is on reliable construction.
            
Fourth, the concurrence avers textualism is difficult to implement.[97]  Far from it.  Today’s case is 
not a difficult one; the Court is unanimous on all but Part III.C.  The 
Insurance Code, given its fair interpretive context, yields a ready 
answer.  I believe it is exceedingly (and unnecessarily) more grueling to 
slog through inconclusive minutiae “not always distinguished for candor or 
accuracy”[98] and that often does more to confuse than 
to clarify.
            
When it comes to judicial opinion-writing, less is quite often more,[99] especially less evidence that cannot be 
trusted.  Analysis based on clear text alone may be shorter, but it is no 
less complete.  And it is more convincing, by definition, than analysis 
based on material we have previously decried as unauthoritative and prone to 
contrivance.  Plus it avoids sending the disquieting message that clear 
text, despite our categorical assurances to the contrary, can never be 
determinative—“that, presumably under penalty of malpractice liability, the 
oracles of legislative history, far into the dimmy past, must always be 
consulted.”[100]  As Justice Jackson first lamented 
60 years ago, this imposes on ordinary citizens a high price, supplanting 
clarity with opacity and accessibility with indeterminacy.[101]
            
I agree with Chief Justice Jefferson 
that an appellate opinion “is not a mere recitation of legal standards 
and conclusions.”[102]  But I disagree with his 
suggestion that opinions provide factual background just to improve 
storytelling.  The foremost reason we include relevant facts is to 
demonstrate we are exercising judicial power properly.  Courts do not issue 
advisory opinions; we decide live, real-world disputes that arise from a given 
set of facts.  We thus describe the underlying facts to show the nature of 
a live controversy, and in the common-law context to help future courts discern 
whether a legal principle fits the facts of other disputes.
*     
*     *
            
The Court’s textual analysis is clear and incisive, and I join it 
unreservedly.  The meaning of the Insurance Code is apparent from its 
language, read in context, especially as contrasted with the Labor and 
Government Codes, both of which explicitly allow disparate-impact 
liability.  All in all, though, I wish the Court were more allegiant to our 
longstanding interpretive precedent.  We should treat similar cases 
similarly, not disparately.  Given the rise of state legisprudence, we owe 
interpretive clarity—and consistency—to the courts below us, the litigants 
before us, the citizens beside us, and the cases beyond us.
 
 
 
                                                                                    
_______________________________________
                                                                                    
Don R. Willett
                                                                                    
Justice
 
OPINION DELIVERED: May 27, 2011






[1] Alex 
Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 652 & n.4 
(Tex. 2006) (“[W]here enacted language is nebulous, we may cautiously consult 
legislative history to help divine legislative intent,” but as a rule, “[i]f the 
text is unambiguous, we must take the Legislature at its word and not rummage 
around in legislative minutiae.”).

[2] 
Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 437 (Tex. 
2009) (citations omitted).

[3] 
Molinet v. Kimbrell, 2011 WL 182230, at *6 (Tex. Jan. 21, 
2011)(citations omitted); Tex. Lottery Comm’n v. First State Bank of 
DeQueen, 325 S.W.3d 628, 637 (Tex. 2010) (citation omitted); City of 
Rockwall v. Hughes, 246 S.W.3d 621, 626 (Tex. 2008) (citations omitted); 
Ex parte Roloff, 510 S.W.2d 913, 915 (Tex. 1974) (citation omitted); 
Fox v. Burgess, 302 S.W.2d 405, 409 (Tex. 1957).

[4] 
Galbraith Eng’g Consultants, Inc. v. Pochucha, 290 S.W.3d 863, 868 
n.5 (Tex. 2009).

[5] __ 
S.W.3d at __ (internal quotation marks omitted).

[6] It 
brings to mind Chico Marx’s classic quip, “I wasn’t kissing her, I was just 
whispering in her mouth.”  The 
Oxford Dictionary of Quotations 451 (Angela Partington ed., 4th ed. 
1992).

[7] ___ 
S.W.3d at ___.

[8] Tex. Ins. Code § 
560.002(c)(3)(C).

[9] 
Id. § 544.002(a).

[10] Tex. Lab. Code § 21.122(a)(1); 
Tex. Gov’t Code 
§ 419.103(b).

[11] 
Russello v. United States, 464 U.S. 16, 23 (1983).

[12] W. 
Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 100 (1991).

[13] 325 
S.W.3d at 637 (“When a statute’s language is clear and unambiguous, it is 
inappropriate to resort to rules of construction or extrinsic aids to 
construe the language.” (emphasis added) (quoting Hughes, 246 S.W.3d at 
626)).

[14] 
Sheshunoff, 209 S.W.3d at 651–52 (“[W]hen a statute’s words are 
unambiguous and yield a single inescapable interpretation, the judge’s inquiry 
is at an end.” (citation omitted)).

[15] In 
re Estate of Nash, 220 S.W.3d 914, 917 (Tex. 2007) (“If a statute is clear 
and unambiguous, we apply its words according to their common meaning without 
resort to rules of construction or extrinsic aids.” (citation 
omitted)).

[16] 
Hughes, 246 S.W.3d at 626 (“When a statute’s language is clear and 
unambiguous, it is inappropriate to resort to rules of construction or extrinsic 
aids to construe the language.”).

[17] 
Entergy, 282 S.W.3d at 437 (“When text is clear, text is 
determinative of [legislative] intent.  This general rule applies unless 
enforcing the plain language of the statute as written would produce absurd 
results.” (citations omitted)).

[18] 
DeQueen, 325 S.W.3d at 637 (“[B]ecause the Legislature expressly 
and unambiguously set out the method for resolving conflicts between the UCC and 
other statutes, it would be improper to go outside the language of the statute 
and use canons of construction to resolve the question.”).

[19] 
Molinet v. Kimbrell, 2011 WL 182230, at *6 (Tex. Jan. 21, 2011) 
(“When a statute’s language is clear and unambiguous it is inappropriate to 
resort to the rules of construction or extrinsic aids to construe the language.” 
(quotation marks omitted)).

[20] A 
needed rule bites the dust.

[21] In 
re Smith, 333 S.W.3d 582, 588 (Tex. 2011) (citations omitted).  Another 
recent case further cemented our view that, notwithstanding the Act’s open-ended 
language, we require an ambiguity predicate: “If we assume that both of 
[two] interpretations are reasonable . . . .”  HCBeck, Ltd. v. Rice, 
284 S.W.3d 349, 356 (Tex. 2009) (emphasis added).

[22] 
Pochucha, 290 S.W.3d at 868 n.5 (“While the language in today’s 
statute is somewhat unclear, thus justifying cautious use of secondary 
construction aids, we recently reaffirmed that such aids ‘cannot override a 
statute’s plain words.’” (citation omitted)).

[23] __ 
S.W.3d at __. 

[24] 
See Tex. Gov’t Code 
§ 311.023(6) (emphasis added).

[25] __ 
S.W.3d at __ (citing to House Research Org., Bill Analysis, Tex. S.B. 14, 78th 
Leg., R.S., 20 (May 21, 2003) and Act of June 2, 2003, 78th Leg., R.S., ch. 201, 
§ 3.01, sec. 15(a), (b)(1), (b)(5)–(6), 2003 Tex. Gen. Laws 916, 920–21 (expired 
Mar. 1, 2005) (previously located at Tex. Ins. Code Ann. art. 21.49-2U, § 15 
(West Supp. 2003))). 

[26] 
Calvert v. Kadane, 427 S.W.2d 605, 608 (Tex. 1968) (citations 
omitted).

[27] 
R.R. Comm’n of Tex. v. Tex. Citizens for a Safe Future & Clean 
Water, 2011 WL 836827, at *4 (Tex. Mar. 11, 2011) (quoting Fiess v. State 
Farm Lloyds, 202 S.W.3d 744, 747 (Tex. 2006)).

[28] 
Id. at *3 (citing Chevron U.S.A. Inc. v. Natural Res. Def. 
Council, Inc., 467 U.S. 837, 842–43 (1984)).

[29] 
__ S.W.3d at 
__.  This approach seems flatly at odds with the concurrence’s embrace of 
our general rule that “extrinsic aids are inappropriate ‘to construe’ an 
unambiguous statute.”  Id. at __.  See also Citizens 
for a Safe Future & Clean Water, 2011 WL 836827, at *12 (Tex. Mar. 11, 
2011) (Jefferson, C.J., concurring) (“We do not defer to agency interpretations 
of unambiguous statutes.”).

[30] Once 
ambiguity opens the door to guarded use of legislative history, having a 
principled rank-order hierarchy strikes me as worthwhile.  What materials 
are most authoritative?  We have never tackled this issue comprehensively, 
but given the often contradictory content within legislative history, plus the 
propensity of lawyers to stress only those snippets that favor their side, it 
seems vital that courts set (and adhere to) standards that minimize contrivance 
and maximize reliability.  Over the years a few judges and scholars have 
proposed various hierarchies, an exercise that depends at least in part upon a 
source’s accessibility, relevance, and reliability.  See generally 
William N. Eskridge, Jr., Philip P. 
Frickey & Elizabeth Garrett, Legislation and Statutory Interpretation 
295–307 (2000) [hereinafter “Eskridge, An Introduction to Statutory 
Interpretation”]; Abner J. Mikva 
& Eric Lane, An Introduction to Statutory Interpretation and the Legislative 
Process 36–41 (1997); Frank B. 
Cross, The Theory and Practice of Statutory Interpretation 64–67 (2009) 
[hereinafter “Cross, The Theory and 
Practice of Statutory 
Interpretation”]; Lars Noah, Divining Regulatory Intent: The Place for 
a “Legislative History” of Agency Rules, 51 Hastings L.J. 255, 274–77 (2000); 
Kenneth W. Starr, Observations About the Use of Legislative History, 1987 
Duke L.J. 371 (1987).  It is 
important to note that such rank-ordering proposals all focus on federal and not 
state legislation.  And while the proposals share some points of 
agreement—the items they deem most probative and least probative—they diverge 
somewhat on the wide middle of the reliability spectrum.  All observers 
rank congressional conference-committee reports (a joint House-Senate 
explanation of the final compromise bill) the highest in terms of 
persuasiveness.  See, e.g., Cross, The Theory and Practice of Statutory Interpretation 64.  
However, there is no comparable document in Texas legislative practice.  
Our Legislature’s version of a conference-committee report merely indicates 
section-by-section which version, House or Senate, the conference committee 
adopted.  Unlike a federal conference-committee report, there is no 
explanatory commentary of what the bill intends to do.  Reliability falls 
off sharply with items like statements from committee and floor proceedings, 
when one begins to fret more about attempts “to manipulate the statute,” 
id. at 67, and suspect that material “might have been strategically 
planted in the record” to give the statute a favored gloss, Eskridge, An Introduction to Statutory 
Interpretation 304.  Finally, most everyone agrees that one hits 
rock bottom on the reliability scale when one consider failed bills, the views 
of nonlegislator opponents/proponents, and post-enactment commentary.

[31] __ 
S.W.3d at __.  The Court also cites to the Legislature’s recodification of 
portions of the Insurance Code, including what is now Section 559.051, which, as 
the Court notes, “made no relevant changes to the Code.”  Id. at 
__.  Variations in enacted text can lend helpful interpretive context, and 
nobody should quarrel with examining how an enacted statute changes over 
time.  Such variations lend helpful interpretive context as they boast the 
imprimatur of the Legislature as a whole.  See Entergy, 282 
S.W.3d at 443 (“We give weight to the deletion of [an enacted] 
phrase . . . since we presume that deletions are intentional 
and that lawmakers enact statutes with complete knowledge of existing law.”) 
(citation omitted).  Put differently, this is the history of the 
legislation, not legislative history.

[32] __ 
S.W.3d at __.

[33] 
District of Columbia v. Heller, 554 U.S. 570, 590 
(2008).

[34] __ 
S.W.3d at  __ (citing Tex. S.B. 167, 79th Leg., R.S. (2005) and Tex. H.B. 
23, 79th Leg., R.S. (2005)).

[35] __ 
S.W.3d at __.

[36] 
Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) 
(quoting United States v. Price, 361 U.S. 304, 313 (1960)).

[37] 
Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1081 (2011).

[38] LTV 
Corp., 496 U.S. at 650.

[39] See 
Fogarty v. United States, 340 U.S. 8, 14 (1950) (“If there is anything in 
these subsequent events at odds with our finding of the meaning of § 3, it would 
not supplant the contemporaneous intent of the Congress which enacted the Lucas 
Act.”).

[40] __ 
S.W.3d at __.

[41] 
E.g., Entergy, 282 S.W.3d at 443–44 (“Just as we decline to 
consider failed attempts to pass legislation, we likewise decline consideration 
of lawmakers’ post-hoc statements as to what statute means.”).

[42] 
Bruesewitz, 131 S.Ct. at 1082.

[43] 
See, e.g., Tex. Emp’t Comm’n v. Holberg, 440 S.W.2d 38, 42 
(Tex. 1969); Brecht v. Abrahamson, 507 U.S. 619, 632 (1993); 
Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306 (1988); City of 
Milwaukee v. Illinois, 451 U.S. 304, 332 n.24 (1981); Transamerica Mortg. 
Advisors, Inc. v. Lewis, 444 U.S. 11, 33 (1979); American Trucking 
Ass’ns, Inc. v. Atchison, Topeka & Santa Fe Ry., 387 U.S. 397, 416-418 
(1967).

[44] 
Entergy, 282 S.W.3d at 443 (quoting Holberg, 440 S.W.2d at 
42) (quotation marks omitted).

[45] 
Holberg, 440 S.W.2d at 42.

[46] 
Id.

[47] See 
Dutcher v. Owens, 647 S.W.2d 948, 950 (Tex. 1983).

[48] 
Brecht, 507 U.S. at 632 (quoting Schneidewind, 485 U.S. at 
306).

[49] Red 
Lion Broad. Co. v. F.C.C., 395 U.S. 367, 381 n.11 (1969).

[50] 
Entergy, 282 S.W.3d at 443 (quoting Heller, 554 U.S. at 
590) (quotation marks omitted).

[51] Reed Dickerson, The Interpretation and 
Application of Statutes 160 (1975).  A bill may boast strong 
bipartisan and bicameral support yet fail on a technical parliamentary point of 
order.  It may be squashed by a contrary committee chair.  It may die 
a mysterious death in the House Calendars Committee.  It may fall prey to 
rigid timetable deadlines.  It may be held hostage as leverage to affect 
other legislation.  It may have 20 votes in the Senate but not the 
traditional 21.  It may get caught in inter-member crossfire.  All to 
say, a bill has many off-ramps.

[52] House 
Research Organization, Texas House of Representatives, About the House 
Research Organization, available at 
http://www.hro.house.state.tx.us/about.aspx (last visited May 26, 2011) 
[hereinafter “House Research Organization, About the House Research 
Organization”].

[53] 
Id.

[54] Eskridge, An Introduction to Statutory 
Interpretation 304.

[55] 
Shapiro v. United States, 335 U.S. 1, 48–49 (1948) (Frankfurter, 
J., dissenting).

[56] Robert 
H. Jackson, Problems of Statutory Interpretation, 8 F.R.D. 121, 125 
(1948).

[57] 
Natural Res. Def. Council v. E.P.A., 526 F.3d 591, 605 (9th Cir. 
2008) (citation and quotation marks omitted).  See also Cross, The Theory and Practice of Statutory Interpretation 66 (“This 
legislative history is generally considered less reliable, because opponents may 
have an incentive to distort the bill to make it appear unreasonable, in order 
to gain allies for its rejection.”).

[58] 524 
U.S. 184 (1998).

[59] 
Id. at 196 (quoting Schwegmann Bros. v. Calvert Distillers 
Corp., 341 U.S. 384, 394 (1951)).

[60] 
Id. (quoting NLRB v. Fruit & Vegetable Packers & 
Warehousemen, Local 760, 377 U.S. 58, 66 (1964)).

[61] 
F.E.C v. Rose, 806 F.2d 1081, 1090 (D.C. Cir. 1986).

[62] Starr, 
1987 Duke L.J. at 377.

[63] Note, 
Why Learned Hand Would Never Consult Legislative History Today, 105 Harv. L. Rev. 1005, 1019 
(1992).

[64] House 
Research Organization, About the House Research Organization.

[65] __ 
S.W.3d at __.

[66] 
Schwegmann Bros., 341 U.S. at 397 (Jackson, J., 
concurring).

[67] 
Id. at 395.

[68] 
Id. at 396.

[69] 
Id.

[70] 
Id.

[71] 
Id. at 397.

[72] 282 
S.W.3d 433 (Tex. 2009).

[73] 
Id. at 442.

[74] 
Id. (citing Nash, 220 S.W.3d at 917, and Sheshunoff, 
209 S.W.3d at 652 n.4).  The Court in Entergy did include a brief 
discussion of so-called legislative history but only after a threshold 
assumption of statutory ambiguity.  And even then, we rejected outright any 
consideration of failed legislation (and of lawmakers’ post-hoc 
statements).  Id. at 442–44.  Instead we credited only how 
enacted language had changed over time, which obviously is not “legislative 
history” but “the legislation’s history.”  Id. at 443.

[75] 
Id. at 437 (citations omitted).

[76] 
Sheshunoff, 209 S.W.3d at 652.

[77] __ 
S.W.3d at __. 

[78] Tex. Gov’t Code § 311.023(3) (emphasis 
added).

[79] 
TGS-NOPEC Geophysical Co. v. Combs, ___ S.W.3d ___, ___ (Tex. 
2011).

[80] 
Hughes, 246 S.W.3d at 632–33 & nn.6–9 (Willett, J., 
dissenting) (citations omitted).

[81] 
Id. at 632 n.6 (noting that the word “cleave” can mean either “to 
adhere” or “to divide”).

[82] Antonin Scalia, Common-Law Courts in 
a Civil Law System: The Role of United States Federal Courts in Interpreting the 
Constitution and Laws, in A Matter 
of Interpretation 3, 37 (Amy Gutmann ed., 1997) [hereinafter “Scalia, A Matter of Interpretation”].  The 
concurrence notes two occasions when Justice Scalia himself cited to legislative 
history.  True enough, but both times reflect settled, if wary, use of 
legislative history by textualist judges who ordinarily eschew such 
material.  Justice Scalia looked at legislative history (1) where 
literalism would inflict absurdity, Green v. Bock Laundry Mach. Co., 490 
U.S. 504, 528 (1989) (Scalia, J., concurring), and (2) to resolve an ambiguity 
arising from a complex regime of interrelated statutes enacted over time—but 
importantly, he did so only after independently verifying a committee report’s 
accuracy and persuasiveness  through other, non-legislative history 
sources, United States v. Fausto, 484 U.S. 439, 444–45 (1998).  The 
concurrence also tries to draw support from Professor Manning’s observation that 
textualist judges, including Justice Scalia, sometimes consult extrinsic sources 
in their search for context.  John F. Manning, Textualism as a 
Nondelegation Doctrine, 97 Colum. L. 
Rev. 673, 702 (1997).  Yes, but the article must be read, like all 
things, in context.  The article was speaking here of using 
“non-legislative history” sources to assign meaning to codified terms of 
art.  Nobody disputes that “if a word is obviously transplanted from 
another legal source, whether the common law or other legislation, it brings its 
soil with it.”  Felix Frankfurter, Some Reflections on the Reading of 
Statutes, 47 Colum. L. Rev. 
527, 537 (1947).  But Professor Manning was referring to extrinsic sources 
beyond legislative history, like Justice Scalia’s use of legal and general-usage 
dictionaries, treatises, and long-repealed statutes to construe a term embedded 
with technical meaning, see Moskal v. United States, 498 U.S. 103, 121 
(1990) (Scalia, J., dissenting).

[83] 
Presidio Ind. Sch. Dist. v. Scott, 309 S.W.3d 927, 929–30 (Tex. 
2010) (“Before parsing the language of § 21.307(a), a brief survey of the 
surrounding statutory landscape provides a helpful context for that section’s 
use of the term ‘party’ . . . .”).

[84] 
See, e.g., Molinet v. Kimbrell, 2011 WL 182230, at *6–7 
(Tex. Jan. 21, 2011) (looking to other semantic cues but declining to excavate 
legislative history when divining relevant statutory context); DeQueen, 
325 S.W.3d at 635–37 (same); Taylor v. Firemen’s & Policemen’s Civil 
Serv. Comm’n of Lubbock, 616 S.W.2d 187, 189–90 (Tex. 1981) 
(same).

[85] See 
John F. Manning, What Divides Textualists From Purposivists?, 106 
Colum. L. Rev. 70 
(2006).

[86] __ 
S.W.3d at __.

[87] Tex. Gov’t Code § 311.023 (emphasis 
added).

[88] __ 
S.W.3d at __ (citing Smith v. City of Jackson, 544 U.S. 228 (2005); 
Gen’l Bldg. Contractors Ass’n, Inc. v. Pennsylvania, 458 U.S. 375 
(1982); Griggs v. Duke Power Co., 401 U.S. 424 (1971)).

[89] The 
Court principally cites Smith, 544 U.S. at 238, to show that “courts have 
looked to a statute’s legislative history when determining whether the statute 
gives rise to a disparate impact theory of liability.”  __ S.W.3d at 
__.  Some courts may have done so, but not this one.  In its certified 
question to us, the Ninth Circuit asks whether Texas law prohibits a 
credit-score factor from working a racially disparate impact, and I would answer 
the question applying ordinary Texas rules of statutory interpretation.  In 
any event, as the Court today acknowledges, the legislative-history piece of 
Smith garnered only plurality, and not majority, support.  
Pre-Smith High Court cases consulted legislative history to determine the 
existence of disparate-impact liability under various antidiscrimination laws, 
but that approach lacked majority support in the Court’s most recent 
disparate-impact decision.
 

[90] __ 
S.W.3d at __.

[91] __ 
S.W.3d at __.

[92] __ 
S.W.3d at __.

[93] 
Holberg, 440 S.W.2d at 42.

[94] 
Entergy, 282 S.W.3d at 443 (quoting Heller, 554 U.S. at 
590).

[95] 
Dutcher, 647 S.W.2d at 950.

[96] Scalia, A Matter of Interpretation 
37.

[97] __ 
S.W.3d at __.

[98] 
Schwegmann Bros., 341 U.S. at 396 (Jackson, J., 
concurring).

[99] So 
says the author of a dissent longer than the majority.  “Physician, heal 
thyself.”  Luke 4:23.

[100] 
Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., 
concurring in the judgment).

[101] 
Schwegmann Bros., 341 U.S. at 397 (Jackson, J., 
concurring).

[102] __ 
S.W.3d at __.